**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**CENTRAL DIVISION**

| | | |
|---|---|---|
| MARY THOME on behalf of herself and all others similarly situated, | ‖ | No. 20-CV-3058-CJW-KEM |
| Plaintiff, | ‖ | **ORDER** |
| vs. | ‖ | |
| THE SAYER LAW GROUP, P.C., | ‖ | |
| Defendant. | ‖ | |

————————————

**TABLE OF CONTENTS**

I.      INTRODUCTION  ............................................................................... 3

II.     RELEVANT BACKGROUND .......................................................... 3

III.    APPLICABLE LAW ......................................................................... 5

    A.      12(b)(1) Motions ..................................................................... 5

    B.      Standing..................................................................................... 7

    C.      FDCPA's Congressional Purpose ............................................. 9

IV.    ANALYSIS......................................................................................... 10

    A.      Concrete Injury ....................................................................... 12

        1.      Intangible Harm........................................................... 13

            a.      The Supreme Court's *TransUnion* Opinion ................... 14

b.     Defining a Close Relationship after *TransUnion* .............16

c.     Application ...........................................................19

2.     Tangible Harm ...........................................................28

B.     Causal Connection ...........................................................30

V.     CONCLUSION ...........................................................33

2

# I.    INTRODUCTION

This matter is before the Court on defendant's renewed motion to dismiss plaintiff's Amended Complaint under Federal Rule of Civil Procedure 12(b)(1).  (Doc. 44); *see also* (Doc. 11).  Plaintiff timely filed a resistance.  (Docs. 58, 61).  Defendant timely filed a reply.  (Doc. 64).  For the following reasons, the Court **denies** defendant's motion.

# II.    RELEVANT BACKGROUND

The following facts are taken from plaintiff's Amended Complaint and are undisputed.  (Doc. 11).  This class action arises from defendant's alleged violations of the Fair Debt Collection Practices Act ("FDCPA"), Title 15, United States Code, Section 1692.  (*Id.*, at 1).  Plaintiff Mary Thome ("Thome") is an Iowa resident and "consumer" within the meaning of Section 1692a(3).  (*Id.*, at 2).[1]  Defendant is an Iowa corporation and an alleged debt collector as defined in Section 1692a(6).  (*Id.*).

Plaintiff brings one count against defendant for various violations of the FDCPA.  (*Id.*, at 10–12).  Plaintiff seeks, on behalf of herself and all others similarly situated, a "declaratory judgment, injunctive relief, as well as statutory damages against" defendant for its practice of sending debt collection letters to various consumers which allegedly violate Sections 1692e, 1692e(2), 1692e(2)(a), 1692e(5), 1692e(10), 1692f, 1692f(1), 1692g, 1692g(a)(3), and 1692g(b).  (*Id.*, at 1, 11).  Plaintiff asserts this Court has subject matter jurisdiction over this action under Title 28, United States Code, Section 1331, because plaintiff's claim arises under federal law.  (*Id.*, at 1).

Title 15, United States Code, Section 1692g, the primary provision at issue here, concerns the specific content that a debt collector must include in a debt collection notice sent to a consumer.  In relevant part, Section 1692g(a)(3) states that a debt collector must

---

[1] The parties stipulated to dismissal without prejudice of Kimberly Usher, also an originally named plaintiff.  (Doc. 40).

Case 3:20-cv-03058-CJW-KEM   Document 65   Filed 10/07/21   Page 3 of 33

send the consumer a written notice containing "a statement that unless the consumer, *within thirty days* after receipt of the notice, disputes the validity of the debt, or any portion thereof, the debt will be assumed to be valid *by the debt collector*." 15 U.S.C. § 1692g(a)(3) (emphasis added). Further, Section 1692g(b) states that "[a]ny collection activities and communication during the 30-day period may not overshadow or be inconsistent with the disclosure of the consumer's right to dispute the debt or request the name and address of the original creditor."

On March 25, 2015, Thome took out a home loan ("Thome Note") for $49,000 secured by a mortgage ("Thome Mortgage") which was subsequently serviced by Wells Fargo Home Mortgage ("Wells Fargo"). (Doc. 11, at 3). Thome later defaulted on the Thome Note by failing to make monthly payments as required under the terms of the Thome Note and Thome Mortgage. (*Id.*). As a result, Wells Fargo retained defendant's services. (*Id.*). On January 27, 2020, defendant sent Thome a letter titled Demand for Payment which demanded that either Thome pay an accelerated balance of $46,055.75 within fourteen days or Wells Fargo would initiate foreclosure proceedings.[2] (Docs. 11, at 4; 11-2, at 1). An attachment to the letter titled Dispute & Validation Notice (the "Notice") warned Thome that if she did not signify to defendant that she disputed the debt within thirty days, then the debt would "be assumed to be valid." (Docs. 11, at 4; 11-2, at 1). It did not specify *who* would assume the debt's validity. (*Id.*). *See also* 15 U.S.C. § 1692g(a)(3) (stating that the debt would be assumed to be valid "by the debt collector"). On February 11, 2020, defendant filed a foreclosure action against Thome. (Doc. 11, at 4). Thome alleges that the Notice left her "confused about her rights" and made her believe she could not contest the debt after fourteen days and the filing of the

---

[2] *See* (Doc. 13-1, at 5–6) (citing Iowa Code § 654.4B(1) ("Prior to commencing a foreclosure on the accelerated balance of a mortgage loan and after termination of any applicable cure period, . . . a creditor shall give the borrower a fourteen-day demand for payment of the accelerated balance to qualify for an award of attorney fees . . . on the accelerated balance.")).

foreclosure action. (*Id.*, at 5). Thome further alleges that as a result of defendant's Notice, she believed that she lost her right to delay foreclosure, feared losing her home, and struggled with mental health and wellness issues. (*Id.*).

Plaintiff alleges, on behalf of herself and others who are similarly situated, that the letter and Notice sent by defendant are improper for two reasons. (*Id.*, at 8). First, plaintiff argues that defendant's demand that the consumer pay the debt within fourteen days "overshadows and contradicts" the consumer's right to contest the debt within thirty days. (*Id.*). Second, plaintiff argues defendant's failure to specify that only the debt collector, as opposed to a court or some other entity, is permitted to assume the debt is valid, if not timely disputed, misleads consumers about their rights. (*Id.*).

On December 3, 2020, plaintiff filed her Complaint in this Court. (Doc. 1). On February 11, 2021, plaintiff filed her Amended Complaint. (Doc. 11). On February 17, 2021, defendant filed its motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), which the Court denied, allowing defendant to reassert its factual attack on the Amended Complaint under 12(b)(1) after further discovery. (Doc. 31). Following discovery, defendant filed this renewed motion to dismiss under 12(b)(1). (Doc. 44).

## III.    APPLICABLE LAW

### A.    12(b)(1) Motions

Federal courts may only hear cases which fall within their limited subject matter jurisdiction. *N. Cent. F.S., Inc. v. Brown*, 951 F. Supp. 1383, 1391–92 (N.D. Iowa 1996). Title 28, United States Code, Section 1331, grants federal courts subject matter jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States."

Under Federal Rule of Civil Procedure 12(b)(1), a defendant may move to dismiss a complaint based on a "lack of subject-matter jurisdiction." The plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence. *V S*

5

*Ltd. P'ship v. Dept. of Hous. & Urb. Dev.*, 235 F.3d 1109, 1112 (8th Cir. 2000) (citation omitted); *Thompson v. Deloitte & Touche LLP*, 503 F. Supp. 2d 1118, 1121 (S.D. Iowa 2007) (citing *Blakemore v. Mo. Pac. R. Co.*, 789 F.2d 616, 618 (8th Cir. 1986)). A defendant can either attack the complaint's asserted jurisdictional basis on its face or the factual basis underlying the court's jurisdiction. *Branson Label, Inc. v. City of Branson*, 793 F.3d 910, 914 (8th Cir. 2015). In a facial challenge, "the court restricts itself to the face of the pleadings, and the non-moving party receives the same protections as it would defending against a motion brought under Rule 12(b)(6)." *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990) (citations omitted). In such cases, the court must "accept as true all factual allegations in the complaint," *Jackson v. Abendroth & Russell, P.C.*, 207 F. Supp. 3d 945, 950 (S.D. Iowa 2016), and should not dismiss the complaint "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [their] claim which would entitle [them] to relief," *Osborn*, 918 F.2d at 729 n.6 (citation and internal quotation marks omitted). "In a factual attack, the court considers matters outside the pleadings, and the non-moving party does not have the benefit of 12(b)(6) safeguards." *Id.* (citations omitted). In such cases, "the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case" and "no presumptive truthfulness attaches to the plaintiff's allegations." *Id.* at 730 (quoting *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)).

The Court has no subject matter jurisdiction if plaintiff lacks standing to pursue a claim. "Article III of the Constitution limits the judicial power of the United States to the resolution of Cases and Controversies, and Article III standing enforces the Constitution's case-or-controversy requirement." *Hein v. Freedom from Religion Found., Inc.*, 551 U.S. 587, 597–98 (2007) (alteration, citation, and internal quotation marks omitted). A plaintiff must have "such a personal stake in the outcome of the controversy as to warrant [their] invocation of federal-court jurisdiction and to justify

6

exercise of the court's remedial powers on [their] behalf." *Warth v. Seldin*, 422 U.S. 490, 498–99 (1975) (citation and internal quotation marks omitted). In other words, the standing requirement ensures that courts hear only "those disputes which are appropriately resolved through the judicial process." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). If a plaintiff lacks standing to pursue a claim, then the court has no subject matter jurisdiction. *Faibisch v. Univ. of Minn.*, 304 F.3d 797, 801 (8th Cir. 2002). Thus, "a standing argument implicates Rule 12(b)(1)." *Id.*

### B.     Standing

The Supreme Court of the United States has established three elements of standing: (1) "the plaintiff must have suffered an 'injury in fact'" which is concrete, particularized, and actual or imminent; (2) "there must be a causal connection between the injury and the conduct complained of[;]" and (3) "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."[3] *Lujan*, 504 U.S. at 560–61 (citations and internal quotations omitted). In determining whether a plaintiff has standing, courts should focus on whether the plaintiff "possesses a legally cognizable interest, or [a] personal stake in the outcome of the action." *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 71 (2013) (citation and internal quotation marks omitted). Courts "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth*, 422 U.S. at 501. "The Court does not assess the overall merits of a plaintiff's claim in the standing inquiry." *Jackson*, 207 F. Supp. 3d at 950 (citation omitted).

An injury is "concrete" when it "actually exist[s]." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016). A plaintiff cannot "allege a bare procedural violation, divorced from any concrete harm, and satisfy the injury-in-fact requirement of Article III." *Id.* at

---

[3] Parties do not dispute redressibility. Thus, the Court will not analyze this prong of the standing doctrine.

1549 (citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009) ("[D]eprivation of a procedural right without some concrete interest that is affected by the deprivation . . . is insufficient to create Article III standing.")).  Concrete injury can exist in the form of "real harm or material risk of harm."  *See Braitberg v. Charter Communications, Inc.* 836 F.3d 925, 930 (8th Cir. 2016) (applying *Spokeo*, 136 S. Ct., at 1549–50).

Concrete injury, however, whether a real harm or material risk of harm, can be intangible.  *Id.*  "In determining whether an intangible harm constitutes injury in fact, both history and the judgment of Congress play important roles."  *Spokeo,* 136 S. Ct., at 1549.  "[H]istory and tradition offer a meaningful guide to the types of cases that Article III empowers federal courts to consider."  *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021) (quoting *Sprint Communications Co. v. APCC Services, Inc.*, 554 U.S. 269, 274 (2008)).  "And the judgment of Congress is important and instructive, as Congress may elevate to the status of legally cognizable injuries concrete, de facto injuries that were previously inadequate in law."  *Jackson*, 207 F. Supp. 3d at 950 (quoting *Spokeo*, 136 S. Ct. at 1549) (alteration and internal quotation marks omitted).

Still, there is no "open-ended invitation for federal courts to loosen Article III based on contemporary, evolving beliefs about what kinds of suits should be heard in federal courts."  *TransUnion*, 141 S. Ct. at 2204.  Courts may not extend Article III power to recognize injuries elevated by Congress that are "not remotely harmful."  *Id.* at 2205 (quoting *Hagy v. Demers & Adams*, 882 F.3d 616, 622 (6th Cir. 2018)).  Likewise, bare "legal infractions" are insufficient.  *Id.* (quoting *Casillas v. Madison Avenue Assocs., Inc.*, 926 F.3d 329, 332 (7th Cir. 2019)).

Instead, each injury must bear "a 'close relationship' to a harm 'traditionally recognized as providing a basis for a lawsuit in American courts."  *Id.* at 2204 (quoting *Spokeo*, 136 S. Ct. at 1541).  "That inquiry asks whether plaintiffs have identified a close historical or common-law analogue for their asserted injury," though "an exact duplicate"

8

is not required.  *Id.*  In sum, "the violation of a procedural right granted by statute can" constitute an injury in fact when it poses a harm or risk of real harm identified by Congress and traditionally accepted as the kind of injury required for Article III standing. *Spokeo*, 136 S. Ct. at 1549.

In addition to being concrete, an injury must be particularized.  *Id.*, at 1545.  "For an injury to be particularized, it must affect the plaintiff in a personal and individual way."  *Id.* (citing *Lujan*, 504 U.S. at 560) (internal quotation marks omitted).  In other words, the injury must be "personal" and "distinct" as to the plaintiff, "not undifferentiated."  *Id.*  (compiling cases, citations omitted).[4]

Moreover, "there must be a causal connection between the injury and the conduct complained of."  *Lujan*, 504 U.S. at 560.  In other words, the injury must be fairly traceable to the conduct at issue, not merely the result of some independent action.  *Id.* When a statutory violation gives rise to an action, the injury must be fairly traceable to the violation of federal law.  *Advantage Media, L.L.C. v. City of Eden Prairie*, 456 F.3d 793, 801 (8th Cir. 2006).

### C.     FDCPA's Congressional Purpose

Title 15, United States Code, Section 1692 lays out the congressional findings and purpose of the FDCPA.  Section 1692(a) states that "abusive, deceptive, and unfair debt collection practices by many debt collectors" have "contribute[d] to the number of personal bankruptcies, to marital instability, to the loss of jobs, and to invasions of individual privacy."  In Section 1692(b), Congress acknowledged that "[e]xisting laws and procedures for redressing these injuries are inadequate to protect consumers."  Thus, Section 1692(e) states that the purpose of the FDCPA is "to eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain

---

[4] Parties do not dispute that plaintiff's alleged injury is particularized.  Thus, the Court will not analyze this element of the injury requirement.

from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." To that end, the FDCPA offers consumers various protections, such as the ability to dispute or verify a debt within thirty days of receiving a notice from a debt collector. *Id.* at § 1692g(b). Further, "[a]ny collection activities and communication during the 30-day period may not overshadow or be inconsistent with the disclosure of the consumer's right to dispute or" verify the debt. *Id.* Overshadowing "occurs when a debt-collection letter conveys information in a confusing or contradictory fashion so as to cloud the required message with uncertainty." *Owens v. Hellmuth & Johnson, PLLC*, 550 F. Supp. 2d 1060, 1064 (D. Minn. 2008) (internal quotation marks and citation omitted).

Congress set forth provisions about disputing and verifying debts to "eliminate the recurring problem of debt collectors dunning the wrong person or attempting to collect debts which the consumer has already paid." S. Rep. No. 95-382, at 4 (1977) *as reprinted in* 1977 U.S.C.C.A.N. 1695, 1699. Congress, however, also recognized that "[c]ollection abuse takes many forms, including . . . misrepresentation of a consumer's legal rights." *Id.*, at 2. Indeed, Congress explicitly sought to protect consumers from all forms of abusive collection practices, even consumers in default. *Id.* at 3. ("[T]he vast majority of consumers who obtain credit fully intend to repay their debts. When default occurs, it is nearly always due to an unforeseen event such as unemployment, overextension, serious illness, or marital difficulties or divorce.").

## IV.    ANALYSIS

Defendant launches a factual attack on plaintiff's Amended Complaint. First, defendant argues plaintiff fails to allege a causal connection between defendant's alleged FDCPA violation and plaintiff's emotional harm because defendant's statements failed to change plaintiff's situation when she was already in danger of losing her home due to missed mortgage payments. (Docs. 45, at 11–14, 64 at 2–4). Second, defendant asserts

10

plaintiff did not suffer a sufficiently concrete injury such that this Court has standing to hear this dispute, because plaintiff cannot fulfill the elements of an analogous traditional injury under American law, as required by *Spokeo* and *TransUnion*. (Docs. 45, at 14–20, 64 at 4–8).

Plaintiff argues defendant's alleged FDCPA violation caused her emotional harm because plaintiff suffered confusion and emotional distress in response to defendant's letter stating she had only fourteen days, not thirty, to dispute her debt and avoid losing her home. (Doc. 61, 19–22). Plaintiff argues her injury was sufficiently concrete because precedent under the Eighth Circuit Court of Appeals and this Court's order denying defendant's first Motion to Dismiss, (Doc. 31), recognize emotional distress and confusion as harms amounting to concrete injury. (*Id.*, at 14–18). Plaintiff argues such a finding is in keeping with *Spokeo* and *TransUnion*, particularly because the Supreme Court implied that confusion and distress are forms of reliance. (Doc. 61, at 17). Plaintiff argues that even though a circuit split exists as to what constitutes a real risk of harm, her injury meets the requirements of all three circuit positions. (*Id.*, at 22–24). Finally, plaintiff argues her injury is also sufficiently concrete because it is inherently substantive, not procedural, according to Title 15, United States Code, Sections 1692e and 1692f. (*Id.*, at 24–27).

In light of the parties' arguments, the Court must consider whether plaintiff (1) has alleged a concrete injury, and (2) that injury is causally connected to the conduct complained of. In its factual analysis under this 12(b)(1) motion, the Court will consider matters outside the pleadings and weigh evidence as necessary to determine its power to hear the case. *See Osborn*, 918 F.2d at 729 n.6. The Court will not presume plaintiff's allegations are true. *Id.* In determining whether standing exists, the Court will not assess the merits of plaintiff's case. *Id.* The Court may, however, weigh the evidence when necessary to determine its power to hear the case. *Id.* Because an injury must first exist

to assess its causal connection to conduct, the Court will begin by addressing the question of concrete injury.

## A. Concrete Injury

Defendant asserts plaintiff did not suffer a concrete injury sufficient for Article III jurisdiction. (Doc. 45, at 11–16). Defendant argues no common-law analogue exists for plaintiff's claim such that her injury fits a traditional type of redressable injury in American law. (Docs. 45, at 14; 64, at 4–8). Defendant asserts such an analogue is required for Article III standing in light of the Supreme Court precedent in *Spokeo* and *TransUnion*, and misrepresentation of information is the most analogous traditional claim. (Doc. 45, at 5, 14). Defendant argues, however, that plaintiff fails to demonstrate an analogous injury because she did not rely on defendant's alleged misrepresentation when she learned she could reinstate her loan and took action to do so within fourteen days of receiving the letter and Notice. (*Id.*, at 5–6, 15–16). Moreover, defendant asserts plaintiff knew her obligation was valid and therefore could not rely to her detriment on defendant's letter. (Doc. 64, at 6). As such, defendant argues plaintiff merely received defendant's letter and did not suffer a concrete injury sufficient for Article III standing. (*Id.*). Defendant also argues plaintiff cannot recover for her emotional distress because defendant's conduct was not extreme and outrageous. (*Id.*, at 6, 17–20).

Plaintiff argues the Eighth Circuit's post-*Spokeo* case law and the Supreme Court's *TransUnion* opinion shows her confusion and emotional distress are concrete injuries. (Doc. 61, at 8–9, 12–15). Plaintiff asserts she would have disputed the amount she owed on her mortgage, even though she admitted to having a legitimate loan with Wells Fargo. (*Id.*, at 11). Plaintiff argues defendant's letter and Notice, however, caused the real risk plaintiff would be misled as to her right to dispute and did result in her confusion, leading to her forfeiture of rights, and her emotional distress. (*Id.*, at 14–16). Moreover,

plaintiff was confused about to whom her debt would be valid because defendant's Notice omitted the words "by the debt collector" when addressing the presumptive validity of the debt. (*Id.*, at 15). Plaintiff argues this Court has already held that emotional distress and confusion are concrete harms for purposes of Article III standing. (*Id.* at 16–17 (citing Doc. 31, at 18 (addressing defendant's facial attack))). Plaintiff argues that even though a circuit split exists as to what constitutes a real risk of harm for Section 1692g violations, her injury meets the requirements of all three circuit positions: receipt, confusion, and intent to dispute or confirm validity of the debt. (*Id.*, at 22–24). Finally, plaintiff argues her injuries are concrete because violations of Sections 1692e and 1692f are inherently substantive, not procedural. (*Id.*, at 24–27).

### 1. *Intangible Harm*

In its Order on defendant's first Motion to Dismiss, the Court stressed that plaintiff's success in demonstrating standing turns on whether plaintiff ever intended to dispute or verify her debts. (*See* Doc. 31, at 12, 16). Since then, the parties have engaged in written discovery and defendant has deposed plaintiff. (Doc. 45-1). In her deposition, plaintiff expressly stated she would have disputed her debt had she known she had thirty days at her disposal to act instead of fourteen days. (*Id.*, at 10 ¶34:24–35:7; 14¶54:10–55:6; *see also id.* at 17 ¶62:11–63:5).[5] As this Court has already found, "the

---

[5] Likewise, defendant points to specific answers in plaintiff's deposition as evidence that plaintiff would not have taken any different action had she known she had thirty days to dispute. (Doc. 64, at 9). As a whole, however, plaintiff's testimony says otherwise. Moreover, just because plaintiff intended to reinstate her loan when faced with what she reasonably believed was a fourteen-day deadline does not mean she would not have disputed it. As she testified in the deposition, plaintiff did not necessarily admit the account balance in the Foreclosure Petition was correct. (*See* Doc. 45-1, at 14 ¶ 50:14–15). But she also did not understand she could still contest it. (*Id.*, at ¶ 50:16–20). And she did not know she had time to obtain representation. (*Id.*, at ¶ 50:21–25, 51:1–6). Believing she had little time to act, plaintiff's goal was to do whatever it took to keep her home. (*Id.*, at ¶ 51:12–25). Though plaintiff's answers are not always clear, the Court attributes this to her relative inexperience with financial terminology.

real risk that plaintiffs may fail to exercise their FDCPA rights," here, the right to dispute debt, "and the distress resulting from being misled are concrete injuries." (Doc. 31, at 14).    Here, plaintiff alleges she failed to dispute her debt because defendant's misrepresentations in its letter and Notice confused her, leading her to believe she had only fourteen days to dispute and to misunderstand the consequences of her failure to do so, and caused related emotional distress.

Thus, the Court must now determine whether its understanding of the concreteness of these alleged injuries is in keeping with the Supreme Court's recent decision in *TransUnion v. Ramirez*.  *See generally* 141 S. Ct. 2190.  The Court will now discuss *TransUnion* and its principles before applying them to the circumstances here.

### a.        The Supreme Court's **TransUnion** *Opinion*

*TransUnion* will guide the Court's determination of whether plaintiff's harms are concrete injuries for purposes of Article III standing.  In the intervening months between defendant's first Motion to Dismiss and this Renewed Motion, the Supreme Court revisited the standing doctrine's concrete harm requirement in *TransUnion*.  *TransUnion* essentially clarifies *Spokeo*'s law on intangible harms and concrete injuries.  *See TransUnion*, 141 S. Ct. at 2204–207.  Although *TransUnion* relies heavily on *Spokeo*, *TransUnion* also emphasizes that new harms created by congressional statutes must bear "a close relationship" to analogues in traditional Article III injuries, and courts should be discerning in their determinations of whether analogous harm exists.  *Id.*, at 2204–205. Thus, though *TransUnion* reinforces *Spokeo*, this Court must be careful to apply its guidance and caution, particularly in the absence of an Eighth Circuit ruling interpreting it.[6]

---

[6] The plaintiffs in *Bassett v. Credit Bureau Services* appealed to the Eighth Circuit Court of Appeals after a post-*TransUnion* district court ruling on post-trial motions.  2021 WL 3579073 (D. Neb. Aug. 13, 2021) *appeal filed*, (8th Cir. Aug. 20, 2021).  The Eighth Circuit, however,

The simplified facts of *TransUnion* are as follows. A plaintiff brought a putative class action under the Fair Credit Reporting Act against TransUnion for erroneously including their credit files on a government watch-list of "specially designated nationals" prohibited from engaging in business in the United States due to their suspected connections with terrorism, drug trafficking, or other serious criminal behavior. 141 S. Ct. at 2201. Named plaintiff Sergio Ramirez sued, alleging in part that TransUnion failed to disclose information about the list and failed to provide him with a summary of rights in its consumer disclosure. *Id.* at 2202. Before trial, "the parties stipulated that the class contained 8,185 members, including Ramirez," and "also stipulated that only 1,853 members of the class (including Ramirez) had their credit reports disseminated by TransUnion to potential creditors." *Id.* At trial, plaintiff did not offer any evidence that the class members were injured, though he demonstrated evidence of his own injury. *Id.* A jury found in favor of the plaintiffs and the Ninth Circuit affirmed most of the district court rulings, including that all class members had Article III standing to recover damages for their claims. *Id.*

On appeal, the Supreme Court reversed the judgment and clarified the principles behind Article III's concrete injury requirement. *See id.* at 2203–214. As the *TransUnion* Court described, congressional intent in creating an injury is "instructive," but not sufficient, in determining whether one exists for Article III purposes. *Id.* at 2204–205. "[U]nder Article III, an injury in law is not an injury in fact." *Id.* at 2205. Instead, the existence of "a close historical or common-law analogue for [a plaintiff's] asserted injury" determines whether a harm based in a statutory violation is a concrete injury. *Id.* at 2204. Further, "downstream consequences" of intangible informational

has yet to hear the case. Moreover, the circumstances in *Bassett*, although FDCPA dependent, are substantially different from those here. *See generally* 2021 WL 3579073, at *2 ("defendants sent [a] form letter to over 9,500 Nebraska residents with allegedly overdue medical debts," at least some of which fail to identify the patient's name or dates of service).

injuries, such as those found in public disclosure cases, may show a harm or real risk of harm. *See id.* at 2214 (citing *Fed. Election Comm'n v. Akins*, 524 U.S. 11 (1998), *Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440 (1989)).  In sum, *TransUnion* provides guidance and clarification for courts and parties analyzing intangible harms elevated by Congress.  But questions remain about how to implement *TransUnion*'s guidance.  The Court examines these questions below.

<strong>b.</strong>    <strong><em>Defining a Close Relationship after</em> TransUnion</strong>

When cautioning that a relationship between an intangible harm created by Congress and a historical or common-law analogue must be "close," *see id.* at 2198, the *TransUnion* Court does not define just how "close" the relationship must be.  Thus, the opinion necessarily leaves open the question of how closely a statutory violation must be related to its historical or common-law analogue such that the violation can meet standing's concrete injury requirement.  For instance, the *TransUnion* Court found certain plaintiffs did not suffer a concrete injury because they were missing the "necessary" publication element to establish a close relationship to a defamation tort analogue. *Id.* at 2209.  But *TransUnion* does not state how many elements an intangible harm must share with a historical or common-law cause of action to be sufficiently analogous, or how to tell if an element is "necessary." *Id.*

This Court need not determine how many elements an FDCPA injury and a historical or common-law analogue harm must share.  One thing is certain: "the [*TransUnion*] Court did not require the harm alleged to be an 'exact duplicate,' so the elements need not be an exact duplicate either." *Ramones v. Experian Information Solutions, LLC*, 2021 WL 4050874, at 3 (S.D. Fla. 2021) (quoting *TransUnion*, 141 S. Ct. at 2209).

When addressing the question of "how close is close," both pre- and post-*TransUnion*, Circuit Courts of Appeals have largely focused on "kind, not degree" of

16

harm, or a functionally equivalent analysis, when determining whether the traditional harm's essence aligns with the statutory violation alleged, such that a close relationship exists. *See Lupia v. Medicredit, Inc.*, 8. F.4th 1184, 1192 (10th Cir. 2021) (focusing on "kind, not degree"); *Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458, 462 (7th Cir. 2020)[7] (Barrett, J.) (same); *Melito v. Experian Marketing Solutions, Inc.*, 923 F.3d 85, 92–95 (2nd Cir. 2019) (focusing on whether harms identified by Congress shared the "same character" as harms in traditional claims); *Salcedo v. Hanna*, 936 F.3d 1162, 1171–73 (11th Cir. 2019) (assessing both kind and degree yet focusing on "qualitative nature of injury" overall); *Van Patten v. Vertical Fitness Group, LLC*, 847 F.3d 1037, 1043 (9th Cir. 2017) (determining closeness based congressional intent and purpose); *Susinno v. WorkOutWorld Inc.*, 862 F.3d 346, 350 (3rd Cir. 2017) (focusing on whether newly established causes of action protect "essentially the same interests" as traditional causes of action). In sum, as a whole, courts generally look to the nature, not extent, of harm. (*See id.*).

The Eighth Circuit addressed the analogue question in *Braitberg v. Charter Communications, Inc.* and *Demarais v. Gurstel Chargo*, *P.A.*, without directly addressing whether the analogy between an intangible harm and a related traditional harm should be measured "in kind" or in "degree." *See generally* 836 F.3d 925, 925–31 (8th Cir. 2016); 869 F.3d 685 (8th Cir. 2017). In *Braitberg*, the plaintiff alleged he was injured because the defendant retained his information for an inappropriate amount of time. *Id.* at 930. He analogized this harm to the common-law tort of invasion of privacy. *Id.* The *Braitberg* Court, however, found that the analogy failed because the defendant did not disclose the information or use it in any way. *Id.* at 930–31. Moreover, the

---

[7] The *TransUnion* Court relied on the *Gadelhak* opinion when analogizing to injuries based in intrusion upon seclusion. 141 S. Ct. at 2204 (citing *Gadelhak*, 950 F.3d 458, 462 (7th Cir. 2020) (Barrett, J.), *cert denied*, ––– U.S. ––––, ––– S.Ct. ––––, 209 L.Ed.2d 568 (2021)).

plaintiff failed to show he faced a real risk of harm from defendant's retention. *Id*. As such, the plaintiff could not show a need to protect his reputation. *See id*.; *see also TransUnion*, 141 S. Ct. at 2211–12. Thus, the Eighth Circuit found the plaintiff's harm was not the kind of harm addressed by the "common law tradition of lawsuits for invasion of privacy" alleged and was therefore not concrete. *Id*.

In *Demarais*, however, the Eighth Circuit found a sufficiently analogous harm. 869 F.3d at 692. There, the plaintiff alleged he was harmed because the defendant attempted to collect a debt from him that did not exist. *Id*. at 690. The *Demarais* Court identified the plaintiff's distress as one of many personal harms that Congress intended the FDCPA to protect against. *See id*. at 699 (also listing confusion). The *Demarais* Court observed the plaintiff's circumstances were "not a situation where '[i]t is difficult to imagine how' the violation of a statutory right alone could cause concrete harm." *Id*. at 692 (quoting *Spokeo*, 136 S. Ct. at 1550). Accordingly, the Eighth Circuit held the risk of the plaintiff's distress was sufficiently analogous to "the risk of mental distress" traditionally recognized as providing the basis for "common-law unjustifiable-litigation torts." *Id*. Accordingly, the *Demarais* Court found the plaintiff's emotional distress was a concrete injury. *Id*.

The Court reads *Braitberg* and *Demarais* as providing the same general guidance as *Spokeo* and *TransUnion*. One could read the Eighth Circuit holdings in these opinions as requiring every element of an analogous tort to demonstrate a comparable analogue. Still, these cases were decided before *TransUnion*, in which the Supreme Court clarified a plaintiff needed to demonstrate a "close relationship" to a traditional harm, but not "an exact duplicate." *TransUnion*, 141 S. Ct. at 2204. Thus, even if *Braitberg* required every element be satisfied, *TransUnion* effectively overruled that requirement. Moreover, requiring every element would also be inconsistent with existing law. If Congress, with its ability to identify and elevate intangible harm, could not do so unless

the harm could already be brought under current law, then its power would be illusory. Thus, this Court views Eighth Circuit precedent as providing the same general guidance found in *Spokeo*, on which both *Braitberg* and *Demarais* rely, and *TransUnion*. Namely, the harm suffered must be the kind of harm suffered and redressed by the traditional analogue.

In light of *TransUnion* and the weight of recent Circuit Court opinions, the Court finds that assessing an FDCPA claim's close relationship to a traditional analogue is assessed "in kind, not degree," but does not require that plaintiff's injury duplicates the elements of an analogous traditional harm. Thus, the Court will assess plaintiff's claims accordingly.

### c.    *Application*

As mentioned above, this Court has already found that "the real risk that plaintiffs may fail to exercise their FDCPA rights and the emotional distress resulting from being misled are concrete injuries regardless of whether plaintiffs ultimately obtained counsel and avoided foreclosure."[8]    (Doc. 31, at 14).    The question, then, is whether this understanding survives defendant's factual attack, particularly in light of the Supreme Court's decision in *TransUnion*. For the following reasons, the Court finds that plaintiff demonstrates by a preponderance of the evidence that she suffered a concrete injury.

---

[8] Here, plaintiff's relevant exercise of her FDCPA rights is her ability to dispute or validate her debt.  Some discrepancy exists between the parties regarding the terms "obligation," "loan," and "foreclosure." (*See* Docs. 45, at 15–16; 61, at 12–14).  The Court finds these arguments are semantic.   In light of plaintiff's deposition testimony, the Court finds the parties' disagreement in terms is more indicative of the inequity between plaintiff's limited insight as a layperson with a mortgage and defendant's professional knowledge as a debt collector. Moreover, these arguments are largely irrelevant to the greater issue of whether plaintiff's FDCPA rights were infringed upon by defendant's misrepresentation.  Similarly, the parties' argument about whether plaintiff "disputed" or "questioned" her debt loses sight of the overarching issue of whether plaintiff's confusion and emotional distress are concrete injuries caused by defendant. (*See id.*).

19

As discussed above, *TransUnion* requires the Court to assess whether the alleged injury has a "close relationship" to a harm "traditionally" recognized as providing a cause of action in American courts: a harm that is a "close historical or common-law analogue for [plaintiff's] asserted injury." 141 S. Ct. at 2204. This is a multi-part question. The Court must assess (1) what harms the FDCPA protects against, (2) what "traditionally" recognized harms are conceivably similar to plaintiff's alleged harm, and (3) whether the asserted harm here "closely related" to those identified harms.

The Court turns to the first part, the harms protected by this FDCPA. Congress discussed freedom from misrepresentation as an interest protected by the FDCPA, identifying "misrepresentation of a consumer's legal rights" as a reason for enacting the bill. *See* S. Rep. No. 95-382, at 2 (1977) *as reprinted in* 1977 U.S.C.C.A.N. 1695, 1696.

The Court now turns to the second part, identifying traditionally recognized harms that seem similar to plaintiff's harm. Plaintiff presents no common-law analogue, relying instead on this Court's prior order stating that her asserted injuries are sufficiently concrete. Defendant, however, posits the closest analogue is either fraudulent misrepresentation or negligent misrepresentation. (Doc. 45, at 5–6). The Restatement Second of Torts codifies several misrepresentation torts including fraudulent misrepresentation and negligent misrepresentation. §§ 525, 552. These torts give a plaintiff a right to sue when the plaintiff suffers harm from justifiably relying on a defendant's misrepresentation. *Id.*

Because both the FDCPA and these common-law torts protect against misrepresentation, the Court may now turn to the second question: whether plaintiff's asserted injury is "closely related" to these traditional common-law misrepresentation torts. To recover for misrepresentation at common law, a plaintiff must "in fact rel[y] upon the misrepresentation in acting or in refraining from action" and that reliance must

be "a substantial factor in bringing about the loss." REST 2D TORTS § 537 cmt. a. *See also* § 537 cmt. b. (stating reliance must be justifiable). In the case of negligent misrepresentation, defendants must make the representation "in the course of [their] business, profession or employment, or in any other transaction in which he has a pecuniary interest." REST 2D TORTS § 552. At common law, a plaintiff must show her detrimental reliance upon the information resulted in pecuniary loss to recover in both fraudulent misrepresentation and negligent misrepresentation.[9] *See* REST 2D TORTS §§ 525, 552(1). As such, common-law misrepresentation requires pecuniary—financial—harm. REST 2D TORTS § 552 cmt. c., 525 cmt. h. It is debatable, however, whether financial harm is merely an element of misrepresentation or the essence of it, such that analogous injuries must also be financial to be "closely related." As discussed above, the asserted harm need not share every element of the historical or common-law cause of action to be "closely related." Meeting all elements is not necessary so long as a plaintiff shows evidence that her harm is closely related to the kind of harm suffered in a historical or common-law cause of action.

Analyzing the third part, the Court finds that detrimental reliance is the harm addressed by misrepresentation torts. Financial harm, in contrast, is an element and therefore not required to demonstrate an analogous relationship per *TransUnion*. As discussed above, in assessing whether the same kind of harm exists, the Court considers whether the harm affects a similar personal interest or results in a mere legal infraction. *TransUnion,* 141 S. Ct. at 2205. The Court must also consider the congressional purpose behind enacting the relevant statutes. *Id.* at 2204. "[T]he essence of an action for misrepresentation, whether negligent or intentional, is the communication of

---

[9] Pecuniary loss is an inherently tangible injury. *TransUnion*, 141 S. Ct. at 2204 ("The most obvious [concrete injuries] are traditional tangible harms, such as physical harms or monetary harms."). *See also Loss-Pecuniary loss*. BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "pecuniary loss" as "[a] loss of money or of something having monetary value").

misinformation on which the recipient relies." *Block v. Neal*, 460 U.S. 289, 296 (1983). In defendant's words, "misrepresentation torts redress a person's interest in being able to make 'decisions in certain settings *free of misinformation generated by others*,' and therefore require reliance (not mere receipt of misinformation)." (Doc. 45, at 5 (quoting John C.P. Goldberg et. al., *The Place of Reliance in Fraud*, 48 ARIZ. L. REV. 1001, 1002 (2006)) (emphasis added)).

Congress likewise discussed freedom from misrepresentation as an interest protected by the FDCPA, identifying "misrepresentation of a consumer's legal rights" as a reason for enacting the bill. *See* S. Rep. No. 95-382, at 2 (1977) *as reprinted in* 1977 U.S.C.C.A.N. 1695, 1696. This protection from misrepresentation is not merely a commitment to the truth. It is a way to remedy specific pecuniary and emotional harms from misrepresentation. Section 1692(a) states that "abusive, deceptive, and unfair debt collection practices by many debt collectors" have "contribute[d] to the number of personal bankruptcies, to marital instability, to the loss of jobs, and to invasions of individual privacy." In Section 1692(b), Congress acknowledged that "[e]xisting laws and procedures for redressing these injuries are inadequate to protect consumers." Thus, Section 1692(e) states that the purpose of the FDCPA is "to eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." Congress, however, also recognized that "[c]ollection abuse takes many forms, including . . . misrepresentation of a consumer's legal rights." Congress's aim appears to be to protect consumers from both pecuniary harms—for example, the personal bankruptcies, and loss of jobs—and emotional harms—for example, marital instability. Congress also appears to be addressing an inequity between the parties; namely, debt collectors are professionals, while consumers ordinarily have no experience with the rules of debt. This

inequity enables abuse, and Congress's 1692(e) provision focuses on remedying this inequity-enabled abuse. For the reasons discussed above, Congress's rationale can stem from economic harm or emotional harm, but it always stems from harms rooted in the inequity of knowledge and access to information that exists between debt collector and debtor.

The misrepresentation torts also show the same focus on the inequity between dealer and consumer, even though the loss is limited to pecuniary loss. In the tort of fraudulent misrepresentation, the loss is economic, but the illustrations show that the losses contemplated stem from an inequity of knowledge and access to information between a dealer or corporation and a consumer. Rest 2d Torts § 525, cmts. (a)–(h). In the tort of negligent misrepresentation, even though the loss is solely pecuniary, Rest 2d Torts § 552, cmt. c, the fact that the defendant must make the statement "in the course of his business, profession or employment, or in any other transaction in which [the defendant] has a pecuniary interest" and guides the plaintiff in plaintiff's "business transactions," shows that that tort, too, stems from an inequity of knowledge and access to information between dealer and consumer. Rest 2d Torts, § 552.

Therefore, the Court finds plaintiff's alleged harm here is sufficiently analogous to the harm suffered in misrepresentation torts. Plaintiff alleges she was confused about her right to dispute her debt because defendant overshadowed that she had thirty days—not fourteen—to dispute her debt. (Doc. 11, at 4–5). Plaintiff alleges she was also confused about who could assume her debt was valid if she did not dispute it because defendant did not clarify who could make this assumption. (*Id.*, at 4). Plaintiff alleges this confusion led to her inadvertent forfeiture of her right to dispute and related emotional distress. (*Id.*, at 5). In short, plaintiff alleges defendant, a debt collector, overshadowed the amount of time she had to dispute her debt and failed to clarify to whom she was obligated. (*Id.*, at 8). In her deposition testimony, she states that she would have disputed

her debt and obtained representation had she known she had thirty days at her disposal instead of fourteen. (Doc. 45-1, at 10 ¶33:23–¶35:21).[10] Due to defendant's alleged misrepresentation, plaintiff believed she had lost her right for the remaining sixteen days. Thus, plaintiff vowed "to save [her] house, no matter how [she] had to do it." (*Id.*, at 14 ¶51:20–21).

Defendant's actions likely match what Congress has previously labeled collection abuse resulting in "misrepresentation of a consumer's legal rights." *See* S. Rep. No. 95-382, at 2 (1977) *as reprinted in* 1977 U.S.C.C.A.N. 1695, 1696. Like proper defendants in misrepresentation torts, defendant invited plaintiff's reliance by sending her a letter and Notice requesting money within a certain number of days. (Doc. 45-1, at 8 ¶27:23–28:13, 10 ¶33:23–¶34:3). By overshadowing plaintiff's later deadline, defendant's letter misrepresented plaintiff's rights. (*Id.*, at 10 ¶33:23–¶34:3). Defendant's emphasis on the fourteen-day deadline confused plaintiff, who also saw the thirty-day deadline but did not know which took precedent. (*Id.*). Because she was confused about which deadline applied to her right to dispute, given that defendant highlighted its right to collect in fourteen days, plaintiff believed she needed to dispute her accelerated balance in fourteen days, not thirty. (*Id.*; *see also id.*, at 61). Defendant's letter and Notice also stated that plaintiff's debt would "be assumed to be valid" if plaintiff did not dispute it. (Docs. 11, at 4; 11-2, at 1). Because it did not specify who would assume the debt's validity, plaintiff was confused whether entities other than defendant would assume her debt was valid if she did not dispute it. (*Id.*). Plaintiff detrimentally relied on defendant's misrepresentation when she became confused about her rights, choosing not to obtain representation and dispute her debt because she believed she did not have enough time.

---

[10] At this point in her deposition, plaintiff says she was "confused between the *fifteen*[-day deadline] and the thirty[-day deadline.]" (Doc. 45-1, at 10 ¶33:25–34:1) (emphasis added). Given that plaintiff consistently references a fourteen-day deadline throughout the rest of the deposition, it is evident that plaintiff misspoke when she mentioned a "fifteen" day deadline.

(Doc. 45-1, at 10 ¶33:23–¶35:21). Plaintiff also suffered related emotional distress, believing that she would lose her home unless she came up with the money in fourteen days instead of the full thirty days available to her. (*Id.*, at 9 ¶30:14–31:12, 13 ¶45:24–46:11). She was severely distraught for "two [or] three days, and "a mess" for "three or four." (*Id.*, at 9 ¶31:12, 32:16–19, 10 ¶33:6–7). Plaintiff needed to obtain professional help and prescription medication to address her distress, which included PTSD, sleep deprivation, and anxiety. (*Id.*, at 9 ¶19–20; Doc. 11, at 5).

Because the FDCPA cause of action is "closely related" to the misappropriation torts, the Court finds that plaintiff successfully pled a "concrete" injury with her confusion and distress stemming from defendant's alleged misrepresentation.

Even though the Court found that a statute protecting both pecuniary harm and confusion and distress is "closely related" to torts that only protect pecuniary harm, the Court's finding is consistent with *TransUnion*. *TransUnion* discusses confusion and distress when analyzing both actual harm and real risk of harm. 141 S. Ct. at 2213. When discussing whether the plaintiffs were actually harmed by the defendant's statutory formatting violations, the *TransUnion* Court listed confusion and distress as harm potentially analogous to "harm traditionally recognized as providing a basis for a lawsuit in American courts." *Id*.

*TransUnion*'s reliance on *Trichell v. Midland Credit Management, Inc.* suggest that consequential harms—termed "downstream consequences"—are key evidence in establishing whether a newly-created harm is sufficiently analogous to traditional harms. *See TransUnion*, 141 S. Ct. at 2214 (citing *Trichell*, 964 F.3d 990, 1004 (11th Cir. 2020)). In *Trichell*, the plaintiffs attempted to analogize their harms to misrepresentation torts but failed to "prov[e] they relied on the representations, much less that the reliance caused them any damages." 964 F.3d at 998. In assessing the plaintiffs' argument, the Eleventh Circuit Court of Appeals differentiated the plaintiffs' alleged informational

injuries from those in the Supreme Court's public disclosure precedent by focusing in part on the "identified consequential harms from the failure to disclose the contested information" in those cases. *Id.* at 1004 (discussing *Akins*, 524 U.S. 11 (1998) and *Pub. Citizen*, 491 U.S. 440 (1989)). The *Trichell* Court termed these identified consequential harms "downstream consequences." *See id.* Unlike the plaintiffs in *Akins* and *Public Citizen*, the *Trichell* Court found its plaintiffs' "allegedly misleading communications . . . failed to mislead." *Id.* Without "comparable downstream consequences," plaintiffs could show no "concrete impact." *Id.* Thus, in citing *Trichell*, the *TransUnion* Court underscores the importance of consequences when analogizing to a harm rooted in reliance. In *TransUnion*, for instance, where the relevant analogue was defamation, confusion and emotional distress could naturally follow from the core injury of publication of false information. *See* 141 S. Ct. at 2214.

*TransUnion* also suggests that alleged injuries without downstream consequences are not concrete. *Id.* at 2213–14. The *TransUnion* Court found certain plaintiffs failed to show a concrete injury when those plaintiffs alleged defamation yet failed to prove publication. *Id.* at 2211. These plaintiffs' names were listed as "specially designated nationals," but they could not prove this designation was shared with anyone. *Id.* In fact, these plaintiffs did not present evidence that they even knew their names were on the list. *Id.* at 2212. As such, their associations with terrorism, drug trafficking, and other serious criminal behavior existed in a vacuum. Thus, because there could be no damage to their reputations without anyone knowing about the "specially designated national" label, the *TransUnion* Court found these plaintiffs did not suffer the kind of harm vindicated in a tort of defamation. *Id.* at 2211–12.

Here, unlike the plaintiffs in *Trichell* or the improper plaintiffs in *TransUnion*, plaintiff has shown her reliance on defendant's misrepresentation. Following the facts alleged, defendant's overshadowing created the risk that plaintiff would be confused

26

about her rights. Plaintiff was indeed confused, which directly resulted in her emotional distress and the inadvertent loss of her right to dispute the debt for an additional sixteen days. (Doc. 45-1, at 9 ¶30:14–31:12, 10 ¶33:23–¶35:21, 13 ¶45:24–46:11). Had plaintiff been free of defendant's misrepresentation about the fourteen-day limitation, she would have obtained an attorney and asserted that right. (*Id.*, at 10 ¶33:23–¶35:21). Thus, in addition to satisfying the *TransUnion* requirements, the Court finds plaintiff's injury also satisfies the various risk of harm tests across the circuit split discussed in the Court's earlier opinion. (*See* Doc. 31, at 12–17). Plaintiff's injury satisfies all three elements of the most demanding test, namely, (1) receipt of a deficient notice, (2) confusion about disputing debt, and (3) an intent to verify or dispute the validity of the debt. *See Johnson v. Wetsch Abbott Osborn Van Vliet PLC*, 3:19-cv-00006, 2019 WL 7666751, at *4 (S.D. Iowa Mar. 21, 2019); *Jackson v. Abendroth & Russell, P.C.*, 207 F. Supp. 3d 945, 954 (S.D. Iowa 2016).

The Court now turns to defendant's remaining arguments. Defendant argues that even if plaintiff successfully analogizes to a traditional harm, she must show defendant's excessive and outrageous conduct caused her emotional harm. Asserting that plaintiff cannot, defendant argues that plaintiff's claims must fail. Defendant distinguishes the circumstances here from those in *Demarais*, where the Eighth Circuit found distress was a concrete injury based on the analogous torts of "malicious prosecution, wrongful use of civil proceedings, and abuse of process." (Doc. 45, at 18 (quoting 869 F.3d at 691)). Defendant notes the defendant in *Demarais* threatened the plaintiff, who had already paid off his debt, with trial if did not pay the defendant. (Doc. 45, at 18). Defendant argues the *Demarais* defendant's behavior was extreme and outrageous, while its alleged overshadowing was not. (*Id.*, at 19–20). Thus, defendant asserts plaintiff's emotional injury cannot be sufficiently concrete. (*Id.*).

Defendant's argument is not persuasive. First, the *Demarais* Court did not discuss

Case 3:20-cv-03058-CJW-KEM   Document 65   Filed 10/07/21   Page 27 of 33

whether the defendant's behavior was extreme and outrageous. It did mention that certain emotional distress may be a "proximate and natural result" of certain tortious behavior, like malicious prosecution. *Demarais*, 869 F.3d at 691 (quoting *Carter v. Oster*, 112 S.W. 995, 999 (Mo. App. 1908)). Here, given the context of home foreclosure, plaintiff's distress may be such a proximate and natural result of defendant's misrepresentation, sufficient to satisfy *Demarais*. Second, as this Court has detailed elsewhere, Eighth Circuit courts have found that confusion and emotional distress are concrete injuries. (*See* Doc. 31, at 18). Third and finally, *TransUnion* mentions intentional infliction of emotional distress as an example of a traditional harm, and does not foreclose all other emotional harm for Article III purposes. 141 S. Ct. at 2211, n.7. To the contrary, *TransUnion* briefly discusses confusion and distress as possible injuries without mentioning that they would not be concrete without defendant's act being extreme and outrageous. *See* 141 S. Ct. at 2213. Thus, *TransUnion* does not overrule the Eighth Circuit holdings. This Court already found plaintiff's confusion and emotional distress are sufficiently concrete and finds no reason to change its position here.

For these reasons, the Court finds plaintiff has shown her harm stemming from her detrimental reliance on defendant's misrepresentation is sufficiently analogous to the detrimental reliance harm in a traditional misrepresentation tort.[11] Thus, her harm meets the concrete injury requirement for Article III standing.

### 2. Tangible Harm

Even though plaintiff does not argue she suffered a tangible injury, the evidence presented suggests a financial injury may exist here. If this is so, plaintiff's monetary

---

[11] Accordingly, the Court does not reach plaintiff's argument that it should classify her statutory injuries as substantive and not procedural, thereby bypassing the analogue requirement. (Doc. 61, at 24–27).

harm would "readily qualify as [a] concrete injur[y] under Article III."[12] *TransUnion*, 141 S. Ct. at 220.

If plaintiff ended up paying more money because she did not think she could dispute her obligation, then she suffered a concrete, tangible harm sufficient to survive defendant's motion to dismiss. In her deposition, plaintiff asserts she paid more money to get her loan current—that is, to pay the accelerated balance—because she kept trying to pay the amount outstanding and then encountering more fees. (*See* Doc. 45-1, at 11, ¶39:9–13, 12 ¶43:21–24, 14 ¶51:16–25) (describing how plaintiff had to pay extra fees to get her loan "current" after receiving foreclosure petition and believing she needed to pay the money to "save [her] house" within fourteen days)). It is unclear from plaintiff's deposition how or when these extra fees accumulated, but at least some seem to have accrued between her receipt of defendant's letter and Notice and when she paid the money outstanding on her mortgage. (*See id.*) If this is so, plaintiff may have been making additional payments when she could have been disputing the amount she owed. In sum, plaintiff's possible pecuniary loss would constitute a tangible harm and concrete injury needing no common-law analogue.

Though plaintiff does not argue she suffered a tangible injury, the Court nevertheless finds the evidence shows that more likely than not plaintiff suffered a financial injury because of defendant's misrepresentation. As discussed above, when a party brings a motion to dismiss based on a factual attack, as defendant does here, the Court may weigh the evidence presented in determining whether it has jurisdiction. If

---

[12] A financial injury would also be sufficiently analogous to the injuries suffered in fraudulent misrepresentation and negligent misrepresentation. But a plaintiff would not need to show a closely analogous relationship for a tangible harm. *See TransUnion*, 141 S. Ct. at 2204 (automatically treating "physical or monetary injury" as a "concrete injury" while stating that intangible harms that have "a close relationship to harms traditionally recognized as providing a basis for lawsuits" are "concrete").

the evidence makes the Court "fairly certain" it can hear the case, then it clears the preponderance of the evidence burden that plaintiff shoulders. Here, plaintiff's deposition makes the Court fairly certain that plaintiff suffered a financial injury due to defendant's misrepresentation and plaintiff may therefore assert a tangible injury as her injury-in-fact.

For these reasons, the Court finds plaintiff demonstrates by a preponderance of the evidence that she suffered a concrete injury.

### B. Causal Connection

Defendant argues that its alleged overshadowing regarding plaintiff's deadline to dispute and failure to clarify who could assume plaintiff's debt was valid could not have caused plaintiff's emotional distress, because "it changed nothing about what she intended to do or not do," and thus the alleged injury would have occurred regardless of whether the defendant actually violated the FDCPA. (Doc. 45, at 11 (quoting *St. Louis Heart Ctr., Inc. v. Nomax, Inc.*, 899 F.3d 500, 504 (8th Cir. 2018)). Citing opinions from the Sixth and Seventh Circuits, defendant argues that plaintiff's emotional injuries were caused by the fact of her default, not by defendant's letter, (Doc. 45, at 12), and thus stemmed from plaintiff's own failure to pay. (Doc. 45, at 12–13). Moreover, defendant argues there is no evidence that plaintiff "acted or refrained from acting based on any alleged misinformation contained" in the letter because she sought legal counsel and learned she could reinstate her loan within the fourteen days, and ultimately did. (*Id.*, at 12). Thus, defendant argues, not knowing she actually had thirty days could not have caused an injury. (*Id.*, at 12–13).

Plaintiff argues there is a plain causal connection between defendant's deficient letter and Notice, plaintiff's being misled about her rights, and plaintiff's resulting confusion and emotional distress. (Doc. 61, 19–20). Plaintiff argues defendant overshadowed other information shared by highlighting the fourteen-day deadline, which

30

caused her to believe she had less than two weeks to resolve her mortgage issue. (*Id.*). Although plaintiff was already experiencing some distress at the prospect of losing her home, she argues "it was exacerbated by the misleading timeframe" conveyed in defendant's letter and Notice. (*Id.*, at 20). Plaintiff asserts she intended to dispute her debt but believed she had only fourteen days to do so because of defendant's alleged misrepresentation. (*Id.*, at 20–22).

Defendant's arguments miss the mark. First, defendant's comparison to *St. Louis Heart Center v. Nomax* is unavailing. Though *Nomax* deals with causal connection, its facts and the harm suffered are substantially different from those here. In *Nomax*, the plaintiff alleged a faxed advertisement that failed to include a proper opt-out notice caused loss in toner and paper, wasted time, and invasions of privacy. 899 F.3d 500, 501–502. The *Nomax* Court found that the defendant's violations were only "technical" and the plaintiff "had the means and opportunity to opt out" of receiving advertisements. *Id.* at 504–505. "All twelve faxes" sent from defendant to plaintiff "contained a box that the recipient could check if he did not wish to receive future faxes, and a domestic fax number to which the form could be returned" to process the opt-out request. *Id.* at 504. There was no evidence that the plaintiff in *Nomax* did not believe it could opt out or that its request would be honored. *See id.* at 504–505. Whereas in *Nomax* the plaintiff had a clear opportunity to opt-out each time the defendant sent a fax, here, reading defendant's letter and Notice, plaintiff was faced with conflicting information and a pressing deadline. Although plaintiff appears to have had the means and opportunity to dispute her accelerated balance, defendant's misrepresentation led her to believe that she could not. By overshadowing information or failing to provide it, defendant prevented plaintiff from understanding and exercising her rights.

Defendant's related argument that plaintiff's anxiety in reaction to the foreclosure stemming from her admittedly valid default is likewise inapposite. (Doc. 45, at 11–13).

31

Although plaintiff was distressed due to the letter's news of the foreclosure, defendant's misrepresentation exacerbated that distress. Thus, defendant was a cause of her distress and her recovery cannot be precluded just because defendant is not the only cause. Apportioning responsibility is a question appropriate for a factfinder.

Defendant's reliance on *Garland v. Orlans,* (*see* Doc. 45, at 12–13), is similarly misplaced. As a preliminary matter, this Court is not bound by Sixth Circuit precedent and considers *Garland* only as an illustrative example. In *Garland*, the plaintiff defaulted on his mortgage and the defendant foreclosed upon it and sent plaintiff many delinquency letters, causing plaintiff to be confused and anxious. 999 F.3d 432, 435–38 (6th Cir. 2021). The Sixth Circuit quickly dismissed confusion, finding it insufficiently analogous to a traditional harm and noting the plaintiff did not argue that the FDCPA intended to make it cognizable. *Id.* at 43–48. Ultimately, plaintiff's alleged anxiety also failed. The Sixth Circuit found plaintiff's anxiety was rooted in the foreclosure, created by plaintiff's default, and because plaintiff defaulted, he could not claim defendant caused his anxiety. *See id.* at 438–440. Instead, such anxiety was traceable to the plaintiff alone. *See id.* at 440–41. Here, the parties do not dispute that plaintiff defaulted. But her alleged injuries—confusion resulting in an inadvertent loss of a right and emotional distress— stemmed from defendant's communications, not plaintiff's default. Though plaintiff caused her default, plaintiff's default did not cause her to believe she had only fourteen days, instead of thirty, to dispute it. As above, even if plaintiff caused *some* of her distress, she did not cause all of it. Moreover, she did not cause her own confusion or loss of right. The Court finds, therefore, that plaintiff meets her burden in presenting evidence that the deficiencies in defendant's letter and Notice caused plaintiff's confusion about her right to dispute, her inadvertent loss of that right, and her related emotional distress.

Thus, the Court finds that plaintiff demonstrates by a preponderance of the evidence that her injuries were caused by defendant's actions.

## V.    CONCLUSION

For these reasons, the Court finds the evidence weighs in favor of the Court's power to hear this case. Thus, the Court finds that defendant's factual attack on plaintiff's Amended Complaint fails. The Court **denies** defendant's motion to dismiss plaintiff's Amended Complaint under Federal Rule of Civil Procedure 12(b)(1). (Doc. 44).[13]

**IT IS SO ORDERED** this 7th day of October, 2021.

_____
C.J. Williams
United States District Judge
Northern District of Iowa

---

[13] The Court also **denies** defendant's related motion to dismiss the putative class claims in light of its findings above. (*See* Doc. 45, at 20).

33